TRACY S. COMBS (California Bar No. 298664)
Email: combst@sec.gov
CASEY R. FRONK (Illinois Bar No. 6296535)
FronkC@sec.gov
Securities and Exchange Commission
351 South West Temple, Suite 6.100
Salt Lake City, UT 84101-1950
Tel.: (801) 524-5796
Fax: (801) 524-3558

FILED _____ LODGED
_____ RECEIVED _____ COPY

AUG 0 5 2022

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No.:  **MC22-00034-PHX** |
| Plaintiff, | |
| v. | **COMPLAINT** |
| MATTHEW WADE BEASLEY; BEASLEY LAW GROUP PC; JEFFREY J. JUDD; CHRISTOPHER R. HUMPHRIES; J&J CONSULTING SERVICES, INC., an Alaska Corporation; J&J CONSULTING SERVICES, INC., a Nevada Corporation; J AND J PURCHASING LLC; SHANE M. JAGER; JASON M. JONGEWARD; DENNY SEYBERT; and ROLAND TANNER; | |
| Defendants, | |
| THE JUDD IRREVOCABLE TRUST; PAJ CONSULTING INC; BJ HOLDINGS LLC; STIRLING CONSULTING, L.L.C.; CJ INVESTMENTS, LLC; JL2 INVESTMENTS, LLC; ROCKING HORSE PROPERTIES, LLC; TRIPLE THREAT BASKETBALL, LLC; ACAC LLC; ANTHONY MICHAEL ALBERTO, JR.; and MONTY CREW LLC; | |
| Relief Defendants. | |

Plaintiff, Securities and Exchange Commission (the "Commission"), alleges as follows:

**SUMMARY**

1.     This case concerns a long-running fraudulent offering of securities perpetrated by Defendants Matthew Wade Beasley, Esq., his law firm Beasley Law Group PC ("Beasley Law Group"), Jeffrey Judd, Christopher Humphries, and three entities that Judd controlled: J&J Consulting Services, Inc. (a Nevada corporation), J&J Consulting Services, Inc. (an Alaska corporation), and J and J Purchasing LLC (unless otherwise noted, collectively, the "J&J Entities"), a scheme for which Judd, Humphries, and Defendants Shane M. Jager, Jason M. Jongeward, Denny Seybert, Roland Tanner, and others acted as promoters.

2.     The scheme worked as follows:  from at least 2017 and continuing through March 2022, the J&J Entities offered investments in purported settlement contracts with tort plaintiffs called "purchase agreements."  These investments in the so-called "purchase agreements" constituted securities under federal law.  Judd, Humphries, and others told investors:

a.   that they could purchase interests in insurance tort settlements, and that the invested money was used to make advance payments to tort plaintiffs who had reached settlements with insurance companies for tort claims and who were willing to pay a premium to receive a portion of their settlement in advance rather than wait for payment from the insurance companies;

b.   that investors would receive returns on their investments of at least 12.5% every 90 days, for an annualized return of 50%, sometimes more, and that the investment had almost zero risk; and

c.   that Beasley and Beasley Law Group managed relationships with numerous personal injury attorneys around the country to maintain a supply of purchase agreements to the J&J Entities and their investors.

3.     From at least 2017 to March 2022, over 600 investors invested in the scheme, and it appears that at least $449 million in investor funds flowed into the scheme through Beasley Law Group's attorney trust ("IOLTA") account at Wells Fargo, N.A.  The amount that investors

1    may have been paid in Ponzi payments is as yet unknown.  During that time, Beasley and Judd

2    acted as business partners in the J&J Entities and Beasley purported to act as an attorney for the

3    J&J Entities.

4        4.    In fact, the purchase agreements were fictitious, a fact which Beasley, Judd, and

5    Humphries knew or were reckless in not knowing.  Beasley, Beasley Law Group PC, Judd, and

6    the J&J Entities did not use investor money to purchase interests in personal injury settlements,

7    as Judd, Humphries, Jager, Jongeward, Seybert, and Tanner represented to actual and

8    prospective investors.

9        5.    Beasley, Judd, and others used a portion of investors' money to make periodic

10   payments of fictitious "returns" on the purchase agreements to investors in a Ponzi-like fashion,

11   but used the bulk of investor money to fund lavish lifestyles, including purchasing luxury homes

12   and properties, a private jet, ATVs, boats, and numerous luxury cars for themselves and their

13   relatives.  Each of Judd, Humphries, Jager, Jongeward, Seybert, and Tanner recruited dozens, if

14   not hundreds, of investors into the scheme and received transaction-based compensation for

15   bringing in additional investors and more money from existing investors, even though none of

16   them was a registered broker or dealer, nor associated with a broker or dealer, registered with the

17   Commission.

18       6.    On March 3, 2022, agents from the Federal Bureau of Investigation ("FBI")

19   executed search warrants at the homes of Judd, Humphries, and Beasley. When agents arrived at

20   Beasley's home, Beasley brandished a pistol and the agents shot him twice. Beasley then locked

21   himself inside his home for nearly four hours. During that standoff, Beasley repeatedly confessed

22   to an FBI negotiator that the J&J Entities' investment scheme was actually a Ponzi scheme that

23   started in 2016 or 2017.

24       7.    The Commission brings this action to halt Defendants' violations of the federal

25   securities laws, prevent further harm to investors, and to seek disgorgement and civil penalties

26   stemming from Defendants' wrongdoing, among other remedies.

27

## JURISDICTION AND VENUE

8.     The Commission brings this action pursuant to Sections 20(b) and 20(d) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77t(b) and (g)] and Sections 21(d) and (e) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78u(d) and (e)] to enjoin such acts, practices, and courses of business, and to obtain disgorgement, prejudgment interest, civil money penalties, and such other and further relief as this Court may deem just and appropriate.

9.     This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

10.     Venue is proper in this Court pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa] because Defendants and Relief Defendants are found, inhabit, and/or transacted business in the District of Nevada and because one or more acts or transactions constituting the violations alleged herein occurred in the District of Nevada.

11.     Defendants were, individually and collectively, involved in the offer and sale of the securities, as that term is defined under Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)] and Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c(a)(10)], issued by Defendants J&J Consulting Services, Inc., a Nevada corporation, J&J Consulting Services, Inc., an Alaska corporation, and J and J Purchasing LLC.

12.     Defendants, directly or indirectly, made use of the mails or the means or instrumentalities of interstate commerce in connection with the conduct alleged in this Complaint.

## DEFENDANTS

13.     **Matthew Wade Beasley** ("Beasley"), age 49, is a resident of Las Vegas, Nevada. Beasley is President, Secretary, Treasurer, and Director of Beasley Law Group PC. Beasley has been licensed to practice law in Nevada since May 2006.

14.     **Jeffrey Jason Judd** ("Judd"), age 50, is a resident of Henderson, Nevada. Judd is director, president, and treasurer of J & J Consulting Services, Inc. (Nevada) and director,

1 president, shareholder, and treasurer of J & J Consulting Services, Inc. (Alaska). Judd is a

2 manager of J & J Purchasing, LLC. Judd personally promoted the "purchase agreement"

3 investment scheme to multiple investors with false and misleading statements and omissions, and

4 he compensated promoters who in turn found additional investors. On information and belief,

5 Judd is a trustee of The Judd Irrevocable Trust.

6   15. **Christopher Ronn Humphries** ("Humphries"), age 48, is a resident of

7 Henderson, Nevada. He personally promoted the "purchase agreement" investment scheme to

8 multiple investors. He is a managing member of CJ Investments LLC.

9   16. **Beasley Law Group PC** ("Beasley Law Group") is a professional corporation

10 organized in Nevada in 2011 with its principal place of business in Nevada. Beasley controls this

11 entity.

12   17. **J&J Consulting Services, Inc.** is a Nevada corporation formed in 2005 with its

13 principal place of business in Nevada ("J&J Nevada"). Judd controls this entity.

14   18. **J&J Consulting Services, Inc.** is also the name of an Alaska corporation,

15 incorporated in 2019, with its principal place of business in Nevada ("J&J Alaska"). Judd

16 controls this entity.

17   19. **J and J Purchasing LLC** ("J and J Purchasing") is a Florida limited liability

18 company formed in October 2021 with its principal place of business in Nevada. Judd controls

19 this entity.

20   20. **Shane Michael Jager** ("Jager"), age 47, is a resident of Henderson, Nevada. He

21 personally promoted the Ponzi scheme to multiple investors and also recruited several additional

22 promoters who worked under his supervision. He received compensation for the investments he

23 procured. Jager is the managing member and owner of Stirling Consulting, L.L.C.

24   21. **Jason Myers Jongeward** ("Jongeward"), age 50, is a resident of Washington,

25 Utah. Jongeward promoted the "purchase agreement" investment scheme to multiple investors

26 and received compensation for the investments he procured. Jongeward is the governor of JL2

27 Investments LLC.

1      22.    **Roland Tanner** ("Tanner"), age 65, is a resident of Henderson, Nevada. He

2 promoted the "purchase agreement" investment scheme to multiple investors and received

3 compensation for the investments he procured.

4      23.    **Denny Seybert** ("Seybert"), age 44, is a resident of Henderson, Nevada. He

5 promoted the "purchase agreement" investment scheme to multiple investors and received

6 compensation for the investments he procured. He is the manager of Rocking Horse Properties,

7 LLC.

8                                   **RELIEF DEFENDANTS**

9      24.    **The Judd Irrevocable Trust** is a trust of unknown date and domicile, believed to

10 be under the control of Matthew Beasley, Jeffrey Judd, and/or Jennifer Judd. On information and

11 belief, Matthew Beasley is a trustee. The Judd Irrevocable Trust received at least $1.4 million in

12 transfers from the Beasley Law Group IOLTA account at Wells Fargo, N.A. ("Beasley Law

13 Group IOLTA"), which were proceeds from the fraud to which it has no legitimate claim.

14      25.    **PAJ Consulting Inc ("PAJ")** is a Nevada corporation formed in October 2019.

15 Preston Judd, Jeffrey Judd's 22-year-old son, is the president, secretary, and treasurer. PAJ

16 received over $990,000 from J&J Consulting Services, Inc. between June 2020 and February

17 2022, which were proceeds of the fraud to which PAJ has no legitimate claim. PAJ also received

18 at least $824,500 from the Beasley Law Group PC IOLTA, which were proceeds from the fraud

19 to which PAJ has no legitimate claim. PAJ's bank records suggest it has no legitimate business

20 operations. It received large distributions of cash from J&J Consulting Services, Inc. and Beasley

21 Law Group PC followed by lavish spending on, *e.g.*, travel, gambling, cryptocurrencies,

22 shopping, and restaurants.

23      26.    **BJ Holdings LLC** is a Nevada limited liability company formed in March 2021.

24 Its managing members are J&J Consulting Services, Inc. and Beasley Law Group, PC. On

25 information and belief, BJ Holdings LLC holds assets that were purchased using investor funds,

26 including a 2008 Hawker Beechcraft 900XP private jet. It received at least $500,000 in transfers

27

1    from the Beasley Law Group IOLTA, which are proceeds from the fraud to which it has no

2    legitimate claim.

3         27.    **Stirling Consulting, L.L.C.** is a Nevada limited liability company formed in

4    April 2018. Its principal place of business is Las Vegas, Nevada. Jager controls this entity.

5    Stirling Consulting, L.L.C. received at least $30 million from the Beasley Law Group IOLTA

6    account. On information and belief, these were proceeds from the fraud to which it has no

7    legitimate claim.

8         28.    **CJ Investments LLC** is a Nevada limited liability company formed in November

9    2019. Its principal place of business is in Henderson, Nevada. Humphries and Jessica Humphries

10   are both managing members of CJ Investments LLC. It received at least $25 million from the

11   Beasley Law Group IOLTA account. On information and belief, these were proceeds from the

12   fraud to which it has no legitimate claim.

13        29.    **JL2 Investments, LLC** is a Washington limited liability company formed in

14   November 2019. Its principal place of business was initially Cheney, Washington. Upon

15   information and belief, its principal place of business moved to Washington, Utah in 2021.

16   Jongeward controls this entity. On information and belief, JL2 Investments received proceeds

17   from the fraud to which it has no legitimate claim.

18        30.    **Rocking Horse Properties LLC** is a Nevada limited liability company formed in

19   January 1997. Its principal place of business is in Nevada. Seybert controls this entity. It received

20   over $690,000 from the Beasley Law Group IOLTA account. On information and belief, these

21   were proceeds from the fraud to which it has no legitimate claim.

22        31.    **Triple Threat Basketball, LLC** is a Nevada limited liability company formed in

23   April 2009. Its managers are Warren Rosegreen and Priscilla Rosegreen. It received transfers of

24   over $9 million from the Beasley Law Group IOLTA account. On information and belief, these

25   were proceeds from the fraud to which Triple Threat Basketball, LLC has no legitimate claim.

26        32.    **ACAC LLC** is a limited liability company of unknown domicile. A bank account

27   in the name of ACAC LLC received at least $6.5 million from the Beasley Law Group IOLTA

1  account. On information and belief, these were proceeds from the fraud to which it has no

2  legitimate claim.

3      33.    **Anthony Michael Alberto, Jr.** ("Alberto"), age 34, is believed to be a resident of

4  Nevada or Pennsylvania. He received nearly $4 million in transfers from the Beasley Law Group

5  IOLTA account. Beasley confessed to an FBI negotiator that Alberto was his bookie and he used

6  investor money to pay gambling debts he owed to Alberto. Alberto has received proceeds from

7  the fraud to which he has no legitimate claim.

8      34.    **Monty Crew LLC** was a Nevada limited liability company formed in January

9  2019. Its principal place of business was in Nevada. It became inactive in September 2021 and

10 was revoked in February 2022. Its manager was Alberto. It received nearly $3 million in

11 transfers from the Beasley Law Group IOLTA account. As stated in paragraph 33 above, Beasley

12 confessed that the money paid to Alberto was proceeds from the fraud used to pay gambling

13 debts. Money Crew LLC received investor money to which it has no legitimate claim.

14                              **FACTS**

15 **I.    Judd, Humphries, and the J&J Entities Raised Money from Investors with False**

16     **Representations of an Investment in Personal Injury Settlements.**

17     35.    Beginning at least as of January 1, 2017 and continuing until March 2022, the J&J

18 Entities, directly and through Judd, Humphries, Jager, Jongeward, Seybert, and Tanner, offered

19 investments in purported personal injury settlement contracts. Judd told investors that he had a

20 litigation financing business with his attorney, Matthew Beasley, whereby Judd invested money

21 in contracts with personal injury plaintiffs while Beasley procured those contracts through his

22 contacts with other attorneys around the country. Judd told investors that Beasley and his law

23 firm Beasley Law Group had relationships with personal injury attorneys whose clients had

24 settlements with insurance companies, and who were willing to pay a premium to receive a

25 portion of their settlement in advance rather than wait for payment from the insurance

26 companies. Judd told investors that the J&J Entities entered into "purchase agreements" with the

27 personal injury plaintiffs whereby the J&J Entities advanced to the personal injury plaintiffs a

1   portion of their expected insurance settlement payout, and the plaintiffs repaid the J&J Entities

2   plus interest and fees when their insurance payout arrived.

3        36.     Judd told investors that the purchase agreements came in amounts of $80,000 or

4   $100,000, with a term of 90 days, although he also said he allowed investors to split contracts

5   with him or other investors if they wanted to invest less than $80,000. Judd told different

6   investors that they would receive different returns. Judd told some investors that they would

7   make up to $22,000 within 90 days on an investment of $100,000. Judd told other investors they

8   would receive 12.5% on their investments (50% on an annual basis), for a return of $12,500

9   within 90 days on an investment of $100,000 or $10,000 within 90 days on an investment of

10   $80,000.

11        37.     Judd told investors that at the end of the 90-day period, the J&J Entities would

12   reinvest the principal in a new purchase agreement with a new tort plaintiff, and the investor

13   could continue to receive his or her promised returns every 90 days. Judd told investors that they

14   could get their principal back rather than reinvesting it at the end of the contract term if they

15   chose.

16        38.     Judd told investors that the tort plaintiffs who entered the purchase agreements

17   paid an administrative fee of $5,000, half of which went to Beasley and Beasley Law Group, and

18   the other half of which went to the tort plaintiff's attorney.  Judd also told investors that Beasley

19   and Beasley Law Group managed the relationships with the various personal injury attorneys and

20   wrote the agreements with the personal injury plaintiffs, while Judd managed the investment side

21   of the business with assistance from his son Parker Judd. On information and belief, Judd

22   highlighted the fact that attorney Beasley was involved and that investor funds flowed through

23   Beasley Law Group's IOLTA account.

24        39.     Judd told investors that the risk from investing in the purchase agreements was

25   almost zero. Judd also told some investors that he would make good any investor loss, saying

26   that he and Beasley had a separate fund to make investors whole if a personal injury plaintiff

27

1   failed to pay on a contract. He claimed he had "never had to use" this fund, because "we've
2   never had one go bad."

3       40.     Humphries, like Judd, promoted the J&J Entities investment scheme to numerous
4   investors. Like Judd, Humphries told investors that the investment involved funding purchase
5   agreements with personal injury plaintiffs who had settlements with insurance companies but
6   wanted to obtain a portion of their money in advance. Humphries told investors that Matthew
7   Beasley and his law firm Beasley Law Group managed the relationships with various attorneys
8   to supply the purchase agreements to Judd and the J&J Entities. Humphries told investors that
9   the purchase agreements were in amounts of $80,000 or $100,000 and paid returns of 13% every
10  90 days. Humphries told investors that their capital would be reinvested in a new purchase
11  agreement at the expiration of each prior purchase agreement. Humphries told investors that
12  there was little to no risk on the investment.

13      41.     Humphries received compensation for bringing new investors into the scheme and
14  for raising additional money from existing investors. He told one investor that he received 5% of
15  the investor funds he raised and that he made around $250,000 every three months.

16      42.     Judd and Humphries typically instructed investors to wire their investment money
17  to Beasley Law Group's IOLTA account at Wells Fargo Bank N.A., but sometimes instructed
18  investors to wire their investment money to other accounts as well, including an account in the
19  name of J&J Consulting Services, Inc. at U.S. Bank, and an account in the name of Humphries'
20  entity CJ Investments LLC.

21  **II.    Defendants' Representations Were Materially False and Misleading**

22      43.     The foregoing representations made to investors by Judd, the J&J Entities, and
23  Humphries were materially false and misleading. Judd and the J&J Entities did not invest the
24  investors' funds in contracts with personal injury plaintiffs. Beasley and Beasley Law Group did
25  not actually procure contracts with personal injury plaintiffs and their attorneys.

26      44.     Beasley confessed on March 3, 2022 to an FBI negotiator that the business was a
27  Ponzi scheme. Beasley and Judd returned a small portion of the invested money to investors in

1 Ponzi-type payments to meet investors' expectations of the promised percentages of returns

2 every 90 days. These payments promoted investor confidence in the scheme, encouraged current

3 investors to invest more money, and allowed Beasley, Judd, and Humphries to continue to find

4 new victims. In reality, Beasley, Judd, and Humphries used the majority of investor money for

5 lavish personal expenses and to pay others to promote the scheme.

6       45.     To lend credibility to the scheme, Beasley created fake "purchase agreements"

7 between J&J Consulting or J and J Purchasing and various purported injured tort plaintiffs and

8 their attorneys, which were then shared with investors by Judd, Humphries and other promoters.

9 Beasley often used the names of real attorneys from around the country (and sometimes even

10 used the names of real personal injury tort plaintiffs) on the fake purchase agreements, but there

11 were no actual underlying tort settlements and the attorneys whose names appeared on the fake

12 purchase agreements had no actual connection to Beasley. An example of one of these "purchase

13 agreements" is attached as **Exhibit A**.

14       46.     Until approximately December 2020, Judd provided investors "Investment

15 Agreements" or "Buyer Agreements" purporting to memorialize the investor's investment in a

16 tort plaintiff's purchase agreement. The agreements were between the investor, and Judd and J&J

17 Consulting Services, Inc. An example of one of the "Investment Agreements" is attached as

18 **Exhibit B**. An example of one titled a "Buyer Agreement" is attached as **Exhibit C.** These

19 agreements were signed by Judd.

20       47.     In approximately October 2021, Judd began telling investors that he was making

21 modifications to the business at the suggestion an attorney who conducted a review of the

22 business. As part of these purported business modifications, Judd formed J and J Purchasing

23 LLC in October 2021 and started operating the investment business through J and J Purchasing.

24 In approximately December 2021, as part of the business modifications, Judd started requiring

25 investors to sign new documentation with J and J Purchasing: a Confidential Private Placement

26 Memorandum ("PPM"); a Non-Compete, Non-Disclosure and Non-Solicitation Agreement; a

27 Mutual Confidentiality and Non-Disclosure Agreement, and a Confidential Subscription

1  Agreement. Judd personally distributed these documents to some investors, and the Promoter

2  Defendants and other promoters distributed copies to their investors. A copy of the PPM is

3  attached as **Exhibit D.**

4        48.    Judd and Humphries told investors that Beasley managed the relationship with the

5  personal injury attorneys and, on information and belief, told investors that they were not

6  allowed to contact the attorneys or plaintiffs whose names appeared on the purchase agreements.

7  This kept investors from learning that the attorneys and plaintiffs on the purchase agreements

8  were not actually parties to the purchase agreements, and that the purchase agreements were

9  fake.

10        49.    Despite this admonition from Judd and Humphries, some investors contacted the

11  attorneys named in the purchase agreements to inquire whether the purchase agreements were

12  real, only to discover that the attorneys had no such personal injury clients and no relationship

13  with Matthew Beasley or Beasley Law Group.

14  **III.    Beasley, Beasley Law Group, Judd, the J&J Entities, and Humphries Acted With**

15          **Scienter**

16        50.    Defendants Beasley, Beasley Law Group, Judd, the Judd Entities, and Humphries

17  knowingly or recklessly engaged in the fraudulent scheme detailed in the paragraphs above.

18        51.    On March 3, 2022, when the FBI attempted to serve a search warrant at his home,

19  Beasley engaged in a standoff for approximately four hours with FBI agents, during which

20  Beasley spoke by telephone with an FBI negotiator. In the recorded calls with the FBI negotiator,

21  Beasley repeatedly confessed that the J&J investment was a Ponzi scheme that he started in 2016

22  or 2017. He confessed that the purchase agreements were fake and he used the names of

23  attorneys he did not know on the purchase agreements.

24        52.    Beasley confessed that investors were promised that their investment money

25  would be given to someone who had settled a personal injury case but had not received their

26  settlement money yet. He confessed that he "got names of attorneys" for the scheme but "I never

27  actually talked to them." He confessed that as Jeffrey Judd found more investors, "I made up

1    more attorney's deals and just kept growing it." Beasley confessed that investors "would give

2    their money to me, and I would supposedly send it to a bunch of attorneys" but actually "I kept it

3    and used it to pay, basically pay them back to pay off gambling debts."

4         53.    Judd knew or was reckless in not knowing that the purchase agreements were fake

5    and that the investment scheme was a fraud.  Judd, as Beasley's business partner in the scheme

6    for over seven years, either knew that the business was a fraud, or was reckless in not knowing.

7    Judd worked intimately with Beasley throughout the entire scheme. Judd told investors that he

8    and Beasley operated the business together and that Beasley was his attorney. Judd told at least

9    one investor that he saw bank statements and other documentation from Beasley.  Had Judd

10   reviewed the bank statements of the Beasley IOLTA account—where, on information and belief,

11   he knew investor funds were aggregated—he would have readily seen that the investment

12   scheme was not a legitimate business and that there were very few, if any, proceeds of personal

13   injury tort settlements pursuant to the purchase agreements flowing into the account.

14        54.    Further, the J&J Entities, which Judd controlled, were the counterparties on all the

15   purported purchase agreements and Judd supposedly signed them on behalf of his entities. As of

16   February 24, 2022, Judd boasted that he had $475 million "under management," was doing 450

17   contracts per week, and had done over 16,000 contracts to date. Judd either knew or was reckless

18   in not knowing that the purported counterparties on those 16,000 contracts did not actually enter

19   the agreements. Judd knew the purchase agreements were never signed by the purported

20   counterparties, or he recklessly disregarded that fact. Had Judd conducted the most basic of due

21   diligence on the fake purchase agreements and the flow of funds to and from Beasley Law

22   Group, it would have revealed the scheme.

23        55.    Upon information and belief, Humphries also knew or was reckless in not

24   knowing that the purchase agreement investment scheme was a fraud.  Upon information and

25   belief, Humphries was at least aware of indicia that the tort settlements at issue in the investment

26   were fictitious and acted to hide that fact from investors.

27

56.     Judd and Humphries acted to hide the fraud from investors by telling them that they were prohibited from contacting the parties to the purchase agreements.  Over the years, despite being told not to do so, several investors contacted the attorneys listed on the purchase agreements and the attorneys denied having such clients or entering the purchase agreements. On information and belief, this information made its way back to the promoters, including Humphries, and ultimately to Judd himself. Various investors pushed their promoters, Judd, and the J&J Entities to answer questions about the inability to verify that the purchase agreements were real, or asked to see documentation such as bank statements showing actual money flows to the purported counterparties on the purchase agreements. When promoters confronted Judd and the J&J Entities about the fact that attorneys on the purchase agreements denied that the purchase agreements were legitimate, Judd hid the fraud by stating to investors that the law firms were probably denying the existence of the contracts simply due to client confidentiality concerns.

57.     At least as early as 2019, Judd started requiring investors to enter non-disclosure agreements as a condition of investing. Judd and his promoters also often required investors to sign a document saying that they were prohibited from contacting any parties related to the personal injury settlement or purchase agreement without the written consent of Jeffrey Judd. Also, the "Investor Agreement" and "Buyer Agreement" documents (Exs. B and C hereto) expressly prohibited investors from contacting the parties on the purchase agreements without Judd's consent.

58.     Ultimately, on or around January 2022, Judd and certain of his promoters decided to stop sending the fake purchase agreements to investors altogether. Judd gave investors the excuse that his "attorneys" had advised him to stop sending the purchase agreements to them.

59.     On information and belief, Judd required investors to sign the document prohibiting them from contacting the parties related to the personal injury settlement or purchase agreement, and ultimately stopped disseminating the fake purchase agreements, because he was attempting to hide their fictitious nature from investors.

13

1    60.    Despite that they knew or were reckless in not knowing that the Purchase

2    Agreements were fake, Humphries and Judd nonetheless continued to solicit new investors and

3    additional investments from existing investors.

4    **IV.    Defendants Judd, Humphries, Jager, Jongeward, Seybert, and Tanner Violated the**

5    **Federal Securities Laws by Acting as Unregistered Brokers.**

6    61.    In addition to Humphries, Judd had several other promoters working underneath

7    him to locate new investors and funnel investment money into the J&J Entities scheme.

8    Defendants Jager, Jongeward, Seybert, and Tanner were among these promoters.

9    62.    Jager, Jongeward, Seybert, and Tanner, like Judd and Humphries, each solicited

10   dozens of investors to invest in the purchase agreements and received transaction-based

11   compensation in return. The investors' interests in the purchase agreements issued by the J&J

12   Entities—which Judd, Jager, Jongeward, Seybert, and Tanner solicited investors to buy—

13   constituted securities as that term is defined under the federal securities laws.

14   63.    In 2020, Humphries stated to at least one investor that he personally made

15   $250,000 every three months from his investor solicitations and received a 5% commission on

16   investments he solicited.

17   64.    Jongeward also made a percentage on each investment he obtained on behalf of

18   the J&J Entities. In early 2022, Jongeward stated to at least one prospective investor that he

19   personally "managed" over 150 investors and about $52 million in investment funds, that this

20   was his "full-time job," and that he had been doing it for two years.

21   65.    In early 2022, Jager stated to at least one prospective investor that he had been

22   soliciting investors for the J&J Entities investment for five years, had solicited 250 investors, and

23   that he and Jongeward together had raised over $200 million from investors for the J&J Entities.

24   Jager also stated to at least one prospective investor that Judd had negotiated a rate of payment to

25   Jager and Jongeward on the investments they raised, and that Tanner worked "under Jager"

26   soliciting investments in the purchase agreements. Judd, Jager, Jongeward, Seybert, and Tanner

27   each used means or instrumentalities of interstate commerce to solicit and sell securities as part

1    of their regular business. Judd, Jager, Jongeward, Seybert, and Tanner each used the internet to

2    solicit investors, transferred cash through wire transfers, and used email and telephone to

3    negotiate and effect sales transactions.

4         66.    Humphries, Jager, Jongeward, and Seybert also handled investor funds. While

5    investor funds typically (but not always) flowed into Beasley Law Group's IOLTA account, the

6    payments of purported "returns" to investors whom Humphries, Jager, Jongeward, and Seybert

7    recruited would flow from accounts held by Beasley Law Group or the J&J Entities into bank

8    accounts for entities controlled by Humphries, Jager, Jongeward, and Seybert. From there,

9    Humphries, Jager, Jongeward, and Seybert would distribute purported "returns" to investors they

10   had solicited.  Sometimes Humphries, Jongeward, and Seybert also instructed investors to wire

11   their investment money directly to the accounts in the names of the entities they controlled rather

12   than to Beasley Law Group's account.

13        67.    Jager used an account in the name of his entity Stirling Consulting, L.L.C., and

14   possibly others, to receive investor funds and also to distribute purported "returns" to investors.

15   Humphries used an account in the name of CJ Investments LLC and JCH Consulting, L.L.C.,

16   among others, to receive investor funds and also distribute Ponzi payments to his investors.

17   Jongeward used an account in the name of his entity JL2 Investments LLC, and possibly others,

18   to receive investor funds and to distribute Ponzi payments to his investors. Seybert used an

19   account in the name of his entity Rocking Horse Properties, LLC, and possibly others, to receive

20   investor funds and distribute purported returns to his investors. Tanner used an account in the

21   name of Anthem Assets, LLC, and possibly others, to receive investor funds and distribute

22   purported returns to his investors.  On information and belief, Jager, Humphries, Jongeward,

23   Seybert, and Tanner also received commission payments for their investor solicitations in the

24   accounts of those entities that they controlled.

25        68.    Tanner solicited numerous investors for the J&J Entities scheme over a period of

26   many months or years.  In early 2022, Jager represented to prospective investors that Tanner

27   worked under his supervision to solicit additional investors for the J&J Entities investment and

that Tanner had raised over $50 million for the J&J Entities. On information and belief, Tanner and received transaction-based compensation for the investors and investments he solicited.

69.     At all relevant times while Judd, Jager, Jongeward, Seybert, and Tanner engaged in soliciting investors to buy interests in the purchase agreements in exchange for transaction-based compensation, none of them were registered with the Commission as a broker or dealer, nor were they associated with a broker or dealer registered with the Commission.

V.     **The Securities Offered and Sold Were Not Registered**

70.     The securities offered and sold by Judd, Humphries, Jager, Jongeward, Seybert, and Tanner were not registered with the Commission.

71.     J and J Purchasing LLC filed a Form D on December 13, 2021, purporting to give notice of an exempt offering under Rule 506(b), but the J&J Entities' offers and sales of securities were not exempt under Rule 506(b) because, among other things, investors were never provided with the required disclosures of information under Rule 502(b) [17 CFR § 230.502]. In addition, the Form D was itself false and misleading in its description of, *inter alia*, the investment and the use of investor funds.

**FIRST CLAIM FOR RELIEF**

**Violations of Section 5(a) and (c) of the Securities Act [15 U.S.C. § 77e(a) and (c)]**

***(Against All Defendants)***

72.     The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1–71, inclusive, as if they were fully set forth herein.

73.     Defendants Beasley, Beasley Law Group, Judd, the J&J Entities, Humphries, Jager, Jongeward, Seybert, and Tanner, by engaging in the conduct described above, directly or indirectly,

     a.   made use of means or instruments of transportation or communication in interstate commerce or of the mails to sell securities, as to which no registration statement was in effect, through the use or medium of any prospectus or otherwise;

1      b.  carried or caused to be carried through the mails or in interstate commerce, by

2         any means or instrument of transportation, securities as to which no

3         registration statement was in effect, for the purpose of sale or for delivery

4         after sale; and

5      c.  made use of any means or instruments of transportation or communications in

6         interstate commerce or of the mails to offer to sell or offer to buy through the

7         use or medium of any prospectus or otherwise securities as to which no

8         registration statement had been filed.

9      74.    In regard to the sale of securities described herein, no exemption validly applied

10  to the registration requirements described above.

11      75.    By reason of the foregoing, Defendants Beasley, Beasley Law Group, Judd, the

12  J&J Entities, Jager, Jongeward, Humphries, Seybert, and Tanner violated, and unless enjoined,

13  will continue to violate, Sections 5(a) and (c) of the Securities Act [15 U.S.C. § 77 e(a) and (c)].

14                       **SECOND CLAIM FOR RELIEF**

15        **Violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)(1)]**

16      *(Against Beasley, Beasley Law Group, Judd, the J&J Entities, and Humphries)*

17      76.    The Commission re-alleges and incorporates by reference each and every

18  allegation in paragraphs 1–75, inclusive, as if they were fully set forth herein.

19      77.    By engaging in the conduct described above, Beasley, Beasley Law Group, Judd,

20  the J&J Entities, and Humphries, and each of them, directly or indirectly, individually or in

21  concert with others, in the offer and sale of securities, by use of the means and instruments of

22  transportation and communication in interstate commerce or by use of the mails,

23      a.  employed devices, schemes, or artifices to defraud;

24      b.  obtained money or property by means of untrue statements of material fact or

25         omissions to state material facts necessary in order to make the statements

26         made, in light of the circumstances under which they were made, not

27         misleading; and

c.   engaged in transactions, practices, or courses of business which operated or
would operate as a fraud or deceit.

78.      With respect to violations of Section 17(a)(1) of the Securities Act, each of
Defendants Beasley, Beasley Law Group, Judd, the J&J Entities, and Humphries engaged in the
above-referenced conduct knowingly or with severe recklessness.

79.      With respect to violations of Sections 17(a)(2) and (a)(3) of the Securities Act,
each of Defendants Beasley, Beasley Law Group, Judd, the J&J Entities, and Humphries
engaged in the above-referenced conduct was at least negligent in its/his conduct and in making
the untrue and misleading statements alleged herein.

80.      By reason of the foregoing, Beasley, Beasley Law Group, Judd, the J&J Entities,
and Humphries violated and, unless enjoined, will continue to violate Section 17(a) of the
Securities Act [15 U.S.C. § 77q(a)].

## THIRD CLAIM FOR RELIEF

**Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule
10b-5 [17 C.F.R. § 240.10b-5]**

*(Against Beasley, Beasley Law Group, Judd, the J&J Entities, and Humphries)*

81.      The Commission re-alleges and incorporates by reference each and every
allegation in paragraphs 1–80, inclusive, as if they were fully set forth herein.

82.      By engaging in the conduct described above, Beasley, Beasley Law Group, Judd,
the J&J Entities, and Humphries, directly or indirectly, individually or in concert with others, in
connection with the purchase or sale of securities, by use of the means and instrumentalities of
interstate commerce or by use of the mails,

a.   employed devices, schemes, and artifices to defraud;

b.   made untrue statements of material facts and/or omitted to state material facts
necessary in order to make the statements made, in light of the circumstances
under which they were made, not misleading; and

1            c.    engaged in acts, practices, and course of business which operated as a fraud

2                  and deceit upon purchasers, prospective purchasers, and other persons.

3       83.    Each of Beasley, Beasley Law Group, Judd, the J&J Entities, and Humphries

4 engaged in the above-referenced conduct and made the above-referenced untrue and misleading

5 statements knowingly or with severe recklessness.

6       84.    By reason of the foregoing, each of Beasley, Beasley Law Group, Judd, the J&J

7 Entities, and Humphries have violated and, unless enjoined will continue to violate, Section

8 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R.

9 § 240.10b-5].

10 <u>**FOURTH CLAIM FOR RELIEF**</u>

11 **Violations of Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)]**

12 ***(Against Judd, Humphries, Jager, Jongeward, Seybert, and Tanner)***

13       85.    The Commission re-alleges and incorporates by reference each and every

14 allegation in paragraphs 1–84, inclusive, as if they were fully set forth herein.

15       86.    By engaging in the conduct described above, Judd, Humphries, Jager, Jongeward,

16 Seybert, and Tanner, and each of them:

17            a.    engaged in the business of effecting transactions in securities for the account

18                 of others; and

19            b.    directly or indirectly, made use of the mails or the means or instrumentalities

20                 of interstate commerce to effect transactions in, or to induce or attempt to

21                 induce the purchase or sale of, securities without being registered as a broker

22                 or dealer with the Commission or associated with a broker or dealer registered

23                 with the Commission.

24       87.    By reason of the foregoing, Judd, Humphries, Jager, Jongeward, Seybert, and

25 Tanner each violated, and unless enjoined will continue to violate, Section 15(a)(1) of the

26 Exchange Act [15 U.S.C. §78o(a)(1)].

27

**FIFTH CLAIM FOR RELIEF**

**Equitable Disgorgement**

*(Against All Relief Defendants)*

88.     The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1–87, inclusive, as if they were fully set forth herein.

89.     Each of the Relief Defendants named in paragraphs 24-34 above obtained money, property, and assets as a result of the violations of the securities laws by Beasley, Beasley Law Group, Judd, the J&J Entities, and Humphries, to which they have no legitimate claim.

90.     Each of the Relief Defendants should be required to disgorge all ill-gotten gains which inured to their benefit under the equitable doctrines of disgorgement, unjust enrichment and constructive trust.

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court enter a final judgment:

**I.**

Permanently restraining and enjoining all Defendants from, directly or indirectly, engaging in conduct in violation of Section 5 of the Securities Act [15 U.S.C. § 77e(a)(1)];

**II.**

Permanently restraining and enjoining Defendants Beasley, the Beasley Law Group, Judd, the J&J Entities, and Humphries from, directly or indirectly, engaging in conduct in violation of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Exchange Act Rule 10b–5 thereunder [17 C.F.R. § 240.10b–5];

**III.**

Permanently restraining and enjoining Defendants Judd, Humphries, Jager, Jongeward, Seybert, and Tanner from, directly or indirectly, engaging in conduct in violation of Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)];

**IV.**

1        Permanently restraining and enjoining each of Defendants Beasley, Beasley Law Group, Judd, and the J&J Entities from, directly or indirectly, including, but not limited to, through any entity owned or controlled by each, the issuance, purchase, or sale of any security related to settled litigation claims, except for the purchase or sale of securities listed on a national securities exchange by these Defendants for their own personal accounts;

**V.**

       Permanently restraining and enjoining each of Defendants Judd, Humphries, Jager, Jongeward, Seybert, and Tanner from, directly or indirectly, including, but not limited to, through any entity owned or controlled by each, soliciting any person or entity to purchase or sell any security;

**VI.**

       Ordering Defendants and Relief Defendants to disgorge all ill-gotten gains or unjust enrichment derived from the activities set forth in this Complaint, together with prejudgment interest thereon;

**VII.**

       Ordering all Defendants to pay a civil penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

**VIII.**

       Retaining jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court; and,

**IV.**

       Granting such other and further relief as this Court may deem just, equitable, or necessary in connection with the enforcement of the federal securities laws and for the protection of investors.

1   Dated:  April 12, 2022.

2                                    Respectfully submitted,

3                                    **SECURITIES AND EXCHANGE COMMISSION**

4

5                                    _/s/ Tracy S. Combs_
                                     Tracy S. Combs
6                                    Casey R. Fronk
                                     Attorneys for Plaintiff
7                                    Securities and Exchange Commission

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

JS 44  (Rev. 10/20)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Securities and Exchange Commission | Matthew Wade Beasley, et al. (See Attachment) |

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Clark County
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Tracy S. Combs and Casey R. Fronk, Securities and
Exchange Commission, 351 S. West Temple, Ste. 6.100,
Salt Lake City, UT 84101: (801) 524-5796

Attorneys *(If Known)*

See Attachment

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| [X] 1  U.S. Government Plaintiff | [ ] 3  Federal Question *(U.S. Government Not a Party)* |
| [ ] 2  U.S. Government Defendant | [ ] 4  Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY**    **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane   [ ] 365 Personal Injury - | [ ] 690 Other | [ ] 423 Withdrawal 28 USC 157 | [ ] 376 Qui Tam (31 USC 3729(a)) |
| [ ] 130 Miller Act | [ ] 315 Airplane Product    Product Liability | | | [ ] 400 State Reapportionment |
| [ ] 140 Negotiable Instrument |    Liability   [ ] 367 Health Care/ | | **PROPERTY RIGHTS** | [ ] 410 Antitrust |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | [ ] 320 Assault, Libel &    Pharmaceutical    Slander     Personal Injury | | [ ] 820 Copyrights | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 330 Federal Employers'    Product Liability | | [ ] 830 Patent | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans) |    Liability   [ ] 368 Asbestos Personal   [ ] 340 Marine     Injury Product | | [ ] 835 Patent - Abbreviated New Drug Application | [ ] 460 Deportation [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 345 Marine Product     Liability    Liability | | [ ] 840 Trademark [ ] 880 Defend Trade Secrets Act of 2016 | [ ] 480 Consumer Credit (15 USC 1681 or 1692) |
| [ ] 160 Stockholders' Suits | [ ] 350 Motor Vehicle   **PERSONAL PROPERTY** | | | [ ] 485 Telephone Consumer |
| [ ] 190 Other Contract | [ ] 355 Motor Vehicle   [ ] 370 Other Fraud | **LABOR** | | Protection Act |
| [ ] 195 Contract Product Liability |    Product Liability   [ ] 371 Truth in Lending | [ ] 710 Fair Labor Standards Act | **SOCIAL SECURITY** | [ ] 490 Cable/Sat TV |
| [ ] 196 Franchise | [ ] 360 Other Personal   [ ] 380 Other Personal    Injury     Property Damage | [ ] 720 Labor/Management Relations | [ ] 861 HIA (1395ff) [ ] 862 Black Lung (923) | [X] 850 Securities/Commodities/ Exchange |
| | [ ] 362 Personal Injury -   [ ] 385 Property Damage    Medical Malpractice    Product Liability | [ ] 740 Railway Labor Act [ ] 751 Family and Medical Leave Act | [ ] 863 DIWC/DIWW (405(g)) [ ] 864 SSID Title XVI | [ ] 890 Other Statutory Actions [ ] 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS**   **PRISONER PETITIONS** | [ ] 790 Other Labor Litigation | [ ] 865 RSI (405(g)) | [ ] 893 Environmental Matters |
| [ ] 210 Land Condemnation | [ ] 440 Other Civil Rights   **Habeas Corpus:** | [ ] 791 Employee Retirement Income Security Act | | [ ] 895 Freedom of Information Act |
| [ ] 220 Foreclosure | [ ] 441 Voting   [ ] 463 Alien Detainee | | **FEDERAL TAX SUITS** | [ ] 896 Arbitration |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment   [ ] 510 Motions to Vacate | | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | [ ] 899 Administrative Procedure |
| [ ] 240 Torts to Land | [ ] 443 Housing/     Sentence    Accommodations   [ ] 530 General | | [ ] 871 IRS—Third Party 26 USC 7609 | Act/Review or Appeal of Agency Decision |
| [ ] 245 Tort Product Liability | [ ] 445 Amer. w/Disabilities -   [ ] 535 Death Penalty | **IMMIGRATION** | | [ ] 950 Constitutionality of State Statutes |
| [ ] 290 All Other Real Property |    Employment   **Other:** | [ ] 462 Naturalization Application | | |
| | [ ] 446 Amer. w/Disabilities -   [ ] 540 Mandamus & Other    Other   [ ] 550 Civil Rights | [ ] 465 Other Immigration Actions | | |
| | [ ] 448 Education   [ ] 555 Prison Condition    [ ] 560 Civil Detainee -     Conditions of     Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | |
|---|---|---|---|---|---|
| [X] 1 Original Proceeding | [ ] 2 Removed from State Court | [ ] 3 Remanded from Appellate Court | [ ] 4 Reinstated or Reopened | [ ] 5 Transferred from Another District *(specify)* | [ ] 6 Multidistrict Litigation - Transfer [ ] 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
15 U.S.C. §§ 77q(a) and (c); 77q(a)(1); 77q(a)(2) and (3); 78j(b); § 78j(b); 78o(a)(1); 78i(a); 17 C.F.R. § 240.10b-5(a) and (c); § 240.10b-5(b)
Brief description of cause:
Offering fraud

## VII. REQUESTED IN COMPLAINT:

[ ] CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND:  [ ] Yes  [X] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____  DOCKET NUMBER _____

DATE
Apr 12, 2022

SIGNATURE OF ATTORNEY OF RECORD
/s/ Tracy S. Combs

FOR OFFICE USE ONLY

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

JS 44 Reverse (Rev. 10/20)  Case 2:22-cv-00612-JCM-EJY   Document 1-1   Filed 04/12/22   Page 2 of 5

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

I.(a) **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

II. **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

III. **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

IV. **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

V. **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

VI. **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

VII. **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

VIII. **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

## ATTACHMENT TO CIVIL COVER SHEET
## SEC V. MATTHEW WADE BEASLEY, ET AL.

### ATTORNEYS FOR DEFENDANTS AND RELIEF DEFENDANTS:

Garrett Ogata, Esq.
Law Offices of Garrett T. Ogata
2880 W. Sahara Avenue
Las Vegas NV 89102
(702) 366-0891
*Counsel for Defendant Matthew Wade Beasley*

Kamille Dean, Esq.
Law Office of Kamille Dean P.L.C
4545 N. 36th St. Ste 202
Phoenix, AZ 85018
(602) 252-5601
*Counsel for Defendant Jeffrey J. Judd and Relief Defendant The Judd Irrevocable Trust*

Peter S. Christiansen, Esq.
Christiansen Trial Lawyers
710 S 7th Street
Las Vegas, NV 89101
702-357-9977
*Counsel for Defendant Christopher R. Humphries*

Kevin Anderson, Esq.
Fabian Van Cott
215 South State Street Suite 1200
Salt Lake City, Utah 84111
702.333.8861
801.323.2225
*Counsel for Defendants J&J Consulting Services, Inc. (Alaska), J&J Consulting Services, Inc. (Nevada), and J and J Purchasing LLC*

T. Louis Palazzo, Esq.
Palazzo Law Firm
520 S 4th St
Las Vegas, NV 89101
(702) 385-3850
*Counsel for Defendant Shane M. Jager*

Thomas Ericsson, Esq.
Oronez & Ericsson LLC
1050 Indigo Dr, #120
Las Vegas, NV 89145

1

702-766-9432
*Counsel for Defendant Jason M. Jongeward*

Lance A. Maningo, Esq.
Maningo Law
400 S 4th St, Ste 650
Las Vegas, NV 89101
(702) 626-4646
*Counsel for Defendant Denny Seybert*

Dyke Huish, Esq.
Huish Law Firm
26161 Marguerite Pkwy, Ste B
Mission Viejo, CA 92692
949-837-8600
*Counsel for Defendant Roland Tanner*


**DEFENDANTS:**

Matthew Wade Beasley;

Beasley Law Group PC;

Jeffrey J. Judd;

Christopher R. Humphries;

J&J Consulting Services, Inc., an Alaska corporation;

J&J Consulting Services, Inc., a Nevada Corporation;

J and J Purchasing LLC;

Shane M. Jager;

Jason M. Jongeward;

Denny Seybert;

Roland Tanner


**RELIEF DEFENDANTS:**

The Judd Irrevocable Trust;

PAJ Consulting Inc;

BJ Holdings LLC;

Stirling Consulting, L.L.C.;

CJ Investments, LLC;

JL2 Investments, LLC;

Rocking Horse Properties, LLC;

Triple Threat Basketball, LLC;

ACAC LLC;

Anthony Michael Alberto, Jr.;

Monty Crew LLC

3

**Securities and Exchange Commission v. Beasley, et al.**
**Case No. _____**

**Complaint**

**Index of Exhibits**

| Exh. No. | Description | Date |
|---|---|---|
| A | Example of Fake Purchase Agreement | 12.18.2020 |
| B | Example of Investor Agreement | 12.29.2020 |
| C | Example of Buyer Agreement | 10.19.2021 |
| D | Confidential Private Placement Memorandum ("PPM") | 12.02.2021 |